IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KEVIN JONES | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DAVID DIGUGLIELMO, et al. | : | NO. 06-137 |

## M E M O R A N D U M  A N D  O R D E R

Ditter, J.                                                                          June 19, 2009

This case comes before me on a habeas corpus petitioner's objections to the proposed

findings, recommendations, and report of a magistrate judge.  Concluding that those proposed

findings are amply supported by the record and that the learned magistrate judge carefully and

accurately applied the law, I will adopt and approve her report and recommendations but will add

additional reasons why the petition must be dismissed.

The petitioner has exhausted his state remedies, first by direct appeal and then by

proceeding under the Pennsylvania Post Conviction Relief Act.  The Superior Court of

Pennsylvania rejected his claims by an opinion dated November 14, 2002, and the Supreme

Court of Pennsylvania denied review.

The petitioner was found guilty by a jury of first degree murder and of lesser offenses

arising out of his possession of a firearm.  He contends that he was denied effective assistance of

counsel, that there was prosecutorial misconduct, and that the cumulative effect was

constitutional error.

These contentions are best viewed in the evidence produced at the petitioner's trial – and particularly from his own testimony.

## I.  FACTUAL BACKGROUND

At approximately nine o'clock on the night of January 15, 1999, the petitioner, Kevin Jones, then nineteen, was selling cocaine from an apartment in Pottstown, Montgomery County. He was approached by Anthony Gibbons to whom he had previously sold cocaine.  Gibbons asked him for cocaine but apparently had no money and so Jones refused his request.  A few minutes later, Gibbons and three other men came to the apartment, two of them put guns to Jones' head, and the four robbed him of money, drugs, and articles of his clothing.

After the robbery, Jones left the apartment – he was scared, nervous, upset, real angry. He wanted his "stuff back." (Trial Tr. 21, Nov. 8, 1999.)  He went to the home of a woman he knew and called friends in Philadelphia.  It was agreed they would come to Pottstown the next day to help him recover his stolen property.  Jones drank, took pills, smoked marijuana, and then fell asleep.  The following day he awoke around four in the afternoon and three of his Philadelphia friends arrived around six.  In their car, guns were distributed – the petitioner receiving an automatic handgun which he assumed was loaded.  Although nothing about guns had previously been said, Jones knew that his friends probably would have them.

They drove to an alley, parked the car, and the four men got out and walked toward a bar where they expected to find Gibbons.  He was spotted at a nearby corner, and when he saw Jones and the other three, he ran into the bar.  They pursued him, but Gibbons escaped even though shots were fired at him.  At some point, shots were fired at Jones and his friends.  They returned to the car – Jones was still mad – and he was thinking that he wanted to get his stuff back.

As they were driving, Jones saw a man whom he believed to have been one of the robbers.  "It looked like him, exactly like him."  (Trial Tr. 33, Nov. 8, 1999.)   He was about a car length away.  Jones was upset.  He was mad when he thought about having been robbed and shot at.  Jones testified to the events that followed:

Q       What did you do?

A       Got out of the car.

Q       Where did you go?

A       On the sidewalk.

Q       When you went to he sidewalk, what did you do?

A       I shot him.

Q       Do you remember where you shot him?

A       I guess in his back.

Q       Do you remember how many times you shot him?

A       I don't remember how many, but from the reports and stuff, it was seven.

(Trial Tr. 35,  Nov. 8, 1999.)

Jones was quickly apprehended and the gun, which he had attempted to hide, was found.

After admitting on cross examination that in an effort to get out of trouble he had lied to the police in each of five statements he made, Jones testified:

Q       And you knew, because you knew these guys, that they were going to come to

        Pottstown with guns; right?

A       I assumed.  I didn't know.  I assumed they would.

Q       And you assumed they would bring one along for you; right?

A       I assumed, yes.

(Trial Tr. 57-58.)

Q       So you saw Kevin Cornish[1] walking down the street; right?

A       Yes.

Q       What went through your mind when you first saw him?

A       He looks like one of the guys who robbed me.

Q       What were you going to do?

A       I just at first wanted to make sure it was him.

Q       Did you do that?

A       Yes.

Q       And you determined in your own mind that he was one of the people that robbed

        you; right?

A       Yes, I did.

Q       Once you made that decision, what were you going to do?

A       Got out of the car.

Q       What were you going to do?

A       Didn't know.  It just happened so quick.

Q       You got out of the car; right?

A       Yes.

Q       Walked up behind him; right?

_____

[1] Anthony Gibbons testified that Jones' victim, Kenneth Cornish, a sixteen-year-old boy, was not involved in the robbery in any way.

A        Yes.

Q        You pulled this gun out from your pants; right?

A        Yes.

Q        What was going through your mind as you took that gun out of your pants?

A        That I was going to shoot him.

Q        That you were going to shoot him?

A        Yes.

Q        When you pointed that gun to his back and pulled the trigger the first time, what was going through your mind?

A         I can't recall.

(Trial Tr. 67-68.)

Jones also said that he could not recall what was going though his mind as he pulled the trigger six more times, the last several as he stood over Cornish and put the last few in him. (Trial Tr. 69-70.)[2]

Jones explained that after the shooting he was still mad because he had not gotten his stuff back and he had just shot somebody.  It had him upset, angry, scared, stressed.  He was agitated because he had just shot somebody in the back seven times.  (Trial Tr. 74, Nov. 8, 1999.)

In view of the petitioner's present arguments for habeas corpus relief, this testimony is significant for the following reasons:

---

[2] Chantelle Raines and Darryl Smale both testified Jones was standing over Cornish when he fired the last two shots.  (Trial. Tr. 5, 37, Nov. 4, 1999.)

First, at no time during trial did Jones say he did not intend to kill Cornish.[3]

Second, he did not see Cornish in the possession of any of his "stuff" nor did he confront Cornish, question him, or search him.   To the contrary, on direct, Jones said he just got out of the car and shot Cornish in the back, and on cross, his thought – as he was pulling the gun from his pants – was that he was going to shoot Cornish.

Third, although Jones said when he first saw Cornish he was upset and he was mad because he had been robbed and shot at, he did not say that either emotion was a factor when he shot Cornish.

Fourth, the emotions he remembered were those following the shooting, motivated by the realization of what he had done.

In short, having been robbed while he was selling cocaine, Jones called for help expecting his friends would bring guns to help him recover his property.  The next evening, he and three other men armed themselves, went looking for the robbers, but, despite shooting at him, failed in their pursuit of Gibbons, the only one Jones mentioned by name.  Jones then spotted a sixteen-year-old boy and killed him in cold blood.[4]

Jones contends that his trial attorney made three errors:

First, by asking the jury to find Jones guilty of manslaughter, he conceded that Jones intended to kill, one of the necessary ingredients of first degree murder;

---

[3] At the time he was sentenced, petitioner apologized to the Cornish family for what he had done, he apologized to his own family and thanked them for their support, he asked for concurrent sentences, but did not deny that he had intended to kill Cornish.

[4] Although it plays no part in my decision here, after the jury announced its verdict, Jones turned to his victim's father and said, "I meant to kill your son, and I'd kill your son again."  As Jones was being lead from the courtroom, he again said to Cornish's father, "I killed your son.  I meant to kill your son, and I'd kill him again." (Trial Tr. 17-18, Dec. 13, 1999.)

Second, this concession amounted to a plea of guilty to which Jones did not consent;

Third, counsel failed to object to an inflammatory prosecutorial statement; and

Fourth, the cumulative effect was to deny Jones a fair trial.

## II.  THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In her Report and Recommendation (Doc. 11), Magistrate Judge M. Faith Angell set forth the facts that led to Jones' conviction, the errors he attributes to trial counsel, and the portions of the record that are the basis of those contentions.  After noting the highly deferential requirement of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, and an opinion of the Superior Court of Pennsylvania that dismissed petitioner's claims, the magistrate judge then made her own evaluation of those claims under applicable federal standards. Although she agreed with the Superior Court's ultimate conclusion, the magistrate judge did not defer to its findings or rely on its decision.

### A.  The *Cronic* Claim

Magistrate Judge Angell first considered whether "trial counsel's error in conceding specific intent [to kill] was a structural error, which under *United States v. Cronic,* 466 U.S. 648[, 656] (1984), removed any opportunity for 'meaningful adversarial testing' at trial."  (Doc. 11 at 21.)  The reference was to trial counsel's pleas to the jury that petitioner should be found guilty of manslaughter rather than first degree murder.[5]  *Cronic* provides that prejudice will be presumed where there is a complete failure by counsel to test the prosecution's case.  Magistrate

---

[5] Trial counsel argued that Jones was acting under sudden and intense passion, exacerbated by the shoot-out moments before.  He told the jury to consider Jones' age and immaturity and the recent sequence of events.  He went on, "Voluntary manslaughter has a horrible name.  It is when you're intentionally slaughtering a man . . . . Ladies and gentlemen, I'm asking that you should find him guilty of voluntary manslaughter, of slaughtering that man Kevin Cornish . . . ."  (Trial Tr. 145-46, Nov. 8, 1999.)

Judge Angell analyzed *Cronic* and the limiting effect of *Bell v. Cone,* 535 U.S. 685, 695-98 (2002), *Florida v. Nixon,* 543 U.S. 175, 189-90 (2004), and *Ditch v. Grace,* 479 F.3d 249, 256 (3d Cir. 2007), and concluded that the *Cronic* presumption of prejudice did not apply.  Trial counsel had moved to suppress identification, cross-examined, adduced evidence favorable to Jones, made appropriate objections, and gave opening and closing addresses.  Conceding specific intent would not have amounted to a complete failure to act as Jones' advocate and therefore there was no *Cronic* presumption of prejudice.

Where the presumption does not apply, *Cronic* requires a defendant to point to specific errors of counsel that will then be evaluated under the standards announced in *Strickland v. Washington,* 466 U.S. 668 (1984).

**B.  The *Brookhart* Claim**

*Brookhart v. Janis,* 384 U.S. 1 (1966), provides that any waiver of a constitutional right must be explicit and knowing to be valid, and that counsel cannot waive his client's right to plead not guilty without the client's participation and agreement.  *Id.* at 5-8.

Jones contends that his counsel's appeal to the jury that he be found guilty of manslaughter and not murder conceded the intent to kill and thus amounted to a plea of guilty without his consent.

Again, Magistrate Judge Angell carefully analyzed this claim particularly in light of *Nixon,* which held that a guilty plea is a stipulation that no proof by the prosecution is required and thus is more than a confession that the accused did certain acts, 543 U.S. at 188.  She concluded that the concession of the intent to kill did not amount to a plea of guilty and that trial counsel's performance should be evaluated under the *Strickland* standards.

-8-

Having determined that neither the *Cronic* presumption of prejudice from a complete failure by counsel or the *Brookhart* plea of guilty proscription were applicable, Magistrate Judge Angell made a *de novo* review of counsel's performance and applying *Strickland,* concluded that in light of the strong evidence of specific intent, Jones had not shown there was a reasonable probability that absent counsel's concession, the results of the trial would have been different.

I agree with Magistrate Judge Angell's conclusions.

**C.  The Prosecutorial Misconduct Claim**

In his closing the assistant district attorney argued that if the jury believed Jones, he would be getting away with murder[6] and that if anger was an acceptable cause for murder, society might as well shut the courts, terminate some of the district attorney's staff, and empty a few of the jails.

After referring to the Superior Court opinion, Magistrate Judge Angell evaluated the prosecutor's remarks using appropriate federal standards.  She pointed out that the prosecutor's remarks were directed to Jones' credibility – though it would have been more accurate to have said that the remarks responded to trial counsel's argument – and were corrected by curative instructions from the trial judge.  She then concluded that the challenged remarks, viewed in the context of the whole trial, did not infect it with unfairness so as to constitute a denial of due process.

I agree with Magistrate Judge Angell's conclusion.

---

[6] Other than saying that prior to the shooting he was mad and upset, Jones did not offer an excuse or suggest that emotion played any part in his killing of Cornish.

### D.  The Cumulative Impact Theory

While individual shortcomings by counsel each may be minimal, in the aggregate they may be egregious and call for habeas relief, but not here.

Having tested Jones' ineffective assistance of counsel claims and found them to be without merit and having determined that any prosecutorial misconduct was not a denial of due process, Magistrate Judge Angell properly concluded in effect that zero plus zero plus zero equals zero.

I agree.

### III.  <u>OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

### A.  The Specific Intent to Kill and Guilty-Plea Arguments

Jules Epstein, Jones' able habeas counsel, objected to the magistrate judge's applications of *Cronic*, *Brookhart*, and *Strickland* contending that "counsel twice conceded the sole element in dispute in his murder trial, the specific intent to kill."   Mr. Epstein asserts that petitioner testified and denied having the intent to kill. (Pet'r's Obj. 1.)

Later, Mr. Epstein puts his argument in this way:  "[Jones'] testimony *denied* the specific intent to kill, claiming instead he was upset and mad." (Pet'r's Obj. 5.)

While perhaps cleverly worded to suggest that Jones testified, "I did not intend to kill," such an argument is not supported by the record.  There was no such testimony.  Jones never denied that he intended to kill Cornish.  Never.  Not on direct.  Not on cross.  Not at the time of sentencing.  Never.

It is true that Jones said on direct that while he was still in the car he was "upset" and "mad," from which it might be inferred that those emotions continued after he got out of the car although he did not say so.  On cross, however, neither emotion was mentioned.  Actually, the only logical inference from Jones' own testimony is that he did intend to kill.

It is more likely that counsel is asserting that Jones' saying he was mad and upset legally amounted to a denial of the intent to kill.

However counsel's statement is intended to be read, it is wrong, both factually and legally.

Jones' claim that he was upset and mad was not a denial of the intent to kill but a denial of malice, the ingredient that separates first degree murder from voluntary manslaughter.  While it is questionable that being mad and upset could rise to the level of the passion required for manslaughter, being mad and upset are an assertion of a state of mind and legally go to malice, not the intent to kill.

The trial judge did not suggest that passion had anything to do with the intent to kill.  To the contrary, he explained the distinction between murder and manslaughter to the jury in these words:

> "[T]here can be no malice when certain reducing circumstances are present.  When these circumstances are present, a killing may be voluntary manslaughter but never murder." (Trial Tr. 218, Nov. 8, 1999.)

> "Murder requires malice.  Manslaughter does not . . . . Voluntary manslaughter is basically an intentional killing for which malice is not proven because of passion or provocation."  (Trial Tr. 221, Nov. 8, 1999.)

> "Murder requires malice.  Manslaughter does not . . . . Voluntary manslaughter is basically an intentional killing for which malice is not proven because of the passion and provocation . . . ."  (Trial Tr. 234, Nov. 8, 1999.)

In short, Mr. Epstein's present argument is exactly the one trial counsel made: Jones was mad and upset and so lacked malice, one of the ingredients of first degree murder. The only difference is that trial counsel did not label Jones' state-of-mind defense as the absence of malice, and Mr. Epstein puts the wrong label on that defense.

It follows that counsel's argument did not concede what Jones had denied, was not the entry of a plea of guilty without Jones' consent, and was not ineffective assistance of counsel.

Then, there is the question Jones does not address. If it was error for trial counsel to argue for manslaughter, what should he have done? Stand mute? Contend that Cornish was not dead? Argue that the seven bullets Jones fired at him from close range were not the cause of death? Assert that the testimony that he stood over Cornish and fired two shots into him did not show an intent to kill? Make a plea for third degree murder and its possible sentence of forty years as opposed to voluntary manslaughter's possible sentence of twenty years? Or what?

Trial counsel's argument that as a result of Jones' being robbed, his youth and immaturity, and his state of mind, the jury should find Jones guilty of manslaughter was the only one that might help Jones in view of the overwhelming evidence that he was guilty of first degree murder.

Trial counsel's jury argument was not error for an additional reason: he properly anticipated that the trial judge would charge that voluntary manslaughter was a possible verdict and his plea for such a finding was therefore justified.

There was no ineffective assistance of counsel.

### B.  The Prosecutorial Misconduct Argument

Jones contends that he was deprived of due process of law when the prosecutor argued that if the jury believed petitioner he will get away with murder and the later comment, that if anger is an accepted as a justification for murder, the courts might as well be shut down, the size of the district attorneys be reduced, and the jails emptied.

I turn to the first comment, the argument that if the jury believed Jones, he would be getting away with murder.  Actually, the comment was flawed because it was misdirected.  It would have been more accurate for the prosecutor to have said if you believe the defendant, you should find him guilty of murder.  Jones' own description of the shooting of Cornish was ample evidence of the premeditated intent to kill.  It was trial counsel who argued for manslaughter; Jones' own testimony that prior to the killing he was mad and upset was not a description of the intense, sudden passion that deprives a killing of malice.

It must be noted that the prosecutor's statement was a response to the manslaughter plea.  It did not ask for a verdict that went beyond the evidence.  It did not manipulate, misstate, or mischaracterize the testimony.  It was not an appeal that sympathy for the Cornish family be a jury consideration.  It was not an appeal to emotion but to common sense.  It was not an appeal to bias or passion.  It was not a particularly hard blow and certainly not a foul one.

Finally, to the extent that it was an erroneous statement of the law, it was quickly corrected by the trial judge who told the jury they should take the law from him.

The comment about shutting down the courts and emptying the jails was a bit of hyperbole, but viewed in the context of this case, no denial of due process.  It is literally true that if being mad and upset were a justification for shooting an innocent victim in the back

-13-

five times with two final shots in the nature of a coup de gras, an important function of the courts would no longer be required and yes, some inmates could argue successfully for freedom.

Any erroneous statement by a prosecutor can be cured where the evidence is strong and here it was overwhelming.  "[T]he quantum or weight of the evidence is crucial to determining whether he prosecutor's arguments during summation were so prejudicial as to result in a denial of due process."  *Moore v. Morton,* 255 F.3d 95, 111 (3d Cir. 2001).  The stronger the evidence, the less likely it is that an improper statement by counsel will affect the verdict.  The prosecutor's comment did not render Jones' trial unfair, much less a denial of due process.

## IV. <u>CONCLUSION</u>

In summary, there was no ineffective assistance of counsel.  To the extent that the prosecutor may have made inappropriate comments during summation, they had no effect on the outcome of the case.  The learned magistrate judge thoroughly reviewed the trial record, correctly applied the law, and therefore her report and recommendation should be approved.

There is no basis for an appeal.